# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **KATHERINE SWEENEY,** | § | |
| | § | **Case No. 4:25-cv-00392-O** |
| **Plaintiff,** | § | |
| | § | |
| v. | § | |
| | § | |
| **ASSOCIATION OF INDEPENDENT MORTGAGE EXPERTS,** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

---

### AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

---

Defendant Association of Independent Mortgage Experts ("Defendant" or "AIME"), as and for its Amended Answer, Affirmative Defenses, and Counterclaims to Plaintiff Katherine Sweeney's ("Plaintiff" or "Ms. Sweeney") Original Petition ("Petition"),[1] states and alleges as follows:

---

[1] Plaintiff commenced this action in state court by filing the Original Petition in the 48th District Court in and for Tarrant County, Texas, on or about February 28, 2025. On April 10, 2025, AIME removed the action to Federal Court. *See, generally*, ECF

1

## ANSWER

1. Defendant denies each and every allegation, matter and thing set forth in Plaintiff's Petition unless otherwise admitted or qualified herein.

2. Defendant is without sufficient information to admit or deny the averments and allegations contained in Paragraph 1.1 of Plaintiff's Petition and therefore denies the same and puts Plaintiff to her strictest burden with respect thereto.

3. Defendant admits the averments and allegations contained in Paragraph 1.2 of Plaintiff's Petition as they relate to Defendant being a non-profit corporation formed pursuant to the laws of Michigan and having a registered office address of 6978 Dixie Highway, Suite B, Clarkston, Michigan 48346. As for the remaining averments and allegations contained in Paragraph 1.2 of Plaintiff's Petition, Defendant denies each and every one of them and puts Plaintiff to her strictest burden with respect thereto.

4. The averments and allegations contained in Paragraph 2.1 of Plaintiff's Petition constitute legal conclusions to which no response is required. To the extent Paragraph 2.1 is deemed to state a factual allegation requiring admission or denial, Defendant further affirmatively states that the

---

No. 1. Where appropriate, AIME refers to the Texas state court pleadings using the caption given them by Plaintiff.

jurisdictional requirements of the District Court for Tarrant County are no longer relevant as the matter has been removed to Federal Court. Defendant admits that the amount in controversy exceeds the minimum jurisdictional requirements for diversity jurisdiction. Except as explicitly admitted, Defendant denies any remaining allegation in Paragraph 2.1 of Plaintiff's Petition.

5. The averments and allegations contained in Paragraph 2.2 of Plaintiff's Petition constitute legal conclusions to which no response is required. To the extent Paragraph 2.2 is deemed to state a factual allegation requiring admission or denial, Defendant denies these allegations and puts Plaintiff to her strictest burden with respect thereto. Defendant further notes that the provisions of Tex. Civ. Prac. & Rem. Code § 15.002(a)(1) are not controlling on this Court and has no further relevance to this action in light of the removal.

6. Defendant is without sufficient information to admit or deny the averments and allegations contained in Paragraph 3.1 of Plaintiff's Petition and therefore denies the same and puts Plaintiff to her strictest burden with respect thereto. Defendant further notes that the provisions of the Texas Rules of Civil Procedure are not controlling on this Court and has no further relevance to this action in light of the removal.

7. The averments and allegations contained in Paragraph 4.1 of Plaintiff's Petition constitute legal conclusions to which no admission or denial is required. To the extent Paragraph 4.1 is deemed to state a factual allegation requiring admission or denial, Defendant denies these allegations and puts Plaintiff to her strictest burden with respect thereto. Defendant further notes that the provisions of the Texas Rules of Civil Procedure are not controlling on this Court and has no further relevance to this action in light of the removal.

8. With respect to the averments and allegations contained in Paragraph 5.1 of Plaintiff's Petition, Defendant denies the averments and allegations contained in Paragraph 5.1 as to Plaintiff "serving as CEO of AIME" and affirmatively states that AIME never named Plaintiff as CEO but, instead, named her Chairman and Director of its Board of Directors. As to the remaining averments and allegations contained in Paragraph 5.1 of Plaintiff's Petition, Defendant denies each and every one of them and puts Plaintiff to her strictest burden with respect thereto.

9. With respect to the averments and allegations contained in Paragraph 5.2 of Plaintiff's Petition, Defendant admits the averments and allegations contained in Paragraph 5.2 as to AIME making nine (9) monthly installment payments each in the amount of $20,000—a total of $180,000—to Plaintiff. As to the remaining averments and allegations contained in Paragraph 5.2 of Plaintiff's

4

Petition, Defendant denies each and every one of them and puts Plaintiff to
her strictest burden with respect thereto.

10. Defendant is without sufficient information to admit or deny the averments
and allegations contained in Paragraph 5.3 of Plaintiff's Petition and therefore
denies the same and puts Plaintiff to her strictest burden with respect thereto.

11. Defendant is without sufficient information to admit or deny the averments
and allegations contained in Paragraph 5.4 of Plaintiff's Petition and therefore
denies the same and puts Plaintiff to her strictest burden with respect thereto.
Subject to and without waiver of this denial, Defendant admits that it received
a letter via electronic mail from an attorney purporting to represent Plaintiff
on or about January 27, 2025. That letter speaks for itself, and, to the extent
that Paragraph 5.4 conflicts with the contents of the letter, those allegations
are denied.

12. With respect to the averments and allegations contained in Paragraph 5.5 of
Plaintiff's Petition, Defendant admits that it responded through counsel to the
letter received on January 27, 2025. The contents of that response speak for
themselves and, to the extent that the allegations in Paragraph 5.5 differ from
the contents of the letter, the same are denied. Defendant further affirmatively
states that Plaintiff never replied to Defendant's letter, instead filing this
lawsuit.

13. In response to Paragraph 6.1 of Plaintiff's Petition, Defendant realleges and reincorporates all of its responses to the averments and allegations contained in the Paragraphs preceding Paragraph 6.1 of Plaintiff's Petition as though fully set forth herein.

14. The averments and allegations contained in Paragraph 7.1 of Plaintiff's Petition constitute legal conclusions to which no response is required. To the extent Paragraph 7.1 is deemed to state a factual allegation requiring admission or denial, Defendant denies these allegations.

15. The averments and allegations contained in Paragraph 8.1 of Plaintiff's Petition constitute legal conclusions to which no response is required. To the extent Paragraph 8.1 is deemed to state a factual allegation requiring admission or denial, Defendant denies these allegations.

16. The averments and allegations contained in Paragraph 9.1 of Plaintiff's Petition constitute legal conclusions to which no response is required. To the extent Paragraph 9.1 is deemed to state a factual allegation requiring admission or denial, Defendant denies these allegations. Defendant further notes that the provisions of the Texas Rules of Civil Procedure are not controlling on this Court and has no further relevance to this action in light of the removal.

17. The averments and allegations contained in Paragraph 10.1 of Plaintiff's Petition constitute legal conclusions to which no response is required. To the extent Paragraph 10.1 is deemed to state a factual allegation requiring admission or denial, Defendant denies these allegations. Defendant further notes that the provisions of the Texas Civil Practice & Remedies Code are not controlling on this Court and has no further relevance to this action in light of the removal.

18. The averments and allegations contained in Paragraph 11.1 of Plaintiff's Petition constitute legal conclusions to which no response is required. To the extent Paragraph 11.1 is deemed to state a factual allegation requiring admission or denial, Defendant denies these allegations. Defendant further notes that the provisions of the Texas Rules of Civil Procedure are not controlling on this Court and has no further relevance to this action in light of the removal.

19. In response to Section 12 of Plaintiff's Petition entitled **"PRAYER"**, Defendant denies that Plaintiff is entitled to any of the relief requested therein.

### AFFIRMATIVE DEFENSES

As and for Defendant's affirmative defenses, Defendant states and alleges as follows:

1. Plaintiff's Petition fails to state a claim upon which relief can be granted.

2. Plaintiff's claims are barred, in whole or in part, because Plaintiff has failed to articulate Plaintiff's claims with sufficient particularity.

3. Plaintiff's claims are barred in their entirety since Plaintiff seeks to enforce a contract that is void ab initio.

4. Plaintiff's claims are barred, in whole or in part, by Plaintiff's fraud.

5. The claims put forth in Plaintiff's Petition are barred by the doctrines of waiver and estoppel, accord and satisfaction, unclean hands, unjust enrichment, license, ratification, and justification.

6. Plaintiff's claims are barred, in whole or in part, by the equitable doctrine of laches.

7. Plaintiff's claims are barred due to prior breach or breaches of contract or failure of conditions precedent.

8. Plaintiff's claims are barred due to illegality.

9. Plaintiff's claims are barred, in whole or in part, because Plaintiff's damages, if any, are a direct or proximate result of Plaintiff's own action, inaction, conduct, or performance, and in violation of her fiduciary duties that she owed to the Defendant.

10. Plaintiff's claims are barred, in whole or in part, because Plaintiff's damages, if any, are a direct or proximate result of the actions, conduct or performance of third parties over whom Defendant has no control.

8

11. Plaintiff's claims are barred, in whole or in part, because Defendant's conduct, acts, and omissions were not the proximate cause of Plaintiff's damages.

12. Plaintiff's claims are barred, in whole or in part, because Plaintiff suffered no compensable damages.

13. Defendant preserves any and all additional affirmative defenses available under Rule 8(c) of the Federal Rules of Civil Procedure, which may be asserted or discovered in discovery in this matter.

## COUNTERCLAIMS

Defendant, as and for its counterclaims against Plaintiff, states as follows:

## I.    AIME

1. On February 5, 2018, AIME was incorporated when it filed its Articles of Incorporation with the Michigan Department of Licensing and Regulatory Affairs ("LARA").

2. On February 8, 2018, AIME filed Amended Articles of Incorporation with LARA.

3. On or about November 7, 2018, the Department of Treasury, Internal Revenue Service ("IRS") issued its determination that AIME qualified as a non-profit organization under Section 501(c)(3) of the Internal Revenue Code, effective February 5, 2018.

4. On December 10, 2019, AIME filed its 2019 Annual Report with LARA, identifying the following Officers and Directors:

    a. Marc Summers ("Mr. Summers") (President, Treasurer, Secretary, and Director);

    b. Stephanie Gray ("Ms. Gray") (as Secretary);

    c. Anthony Casa (as Director); and

    d. Ms. Sweeney (as Director).

5. On September 3, 2020, and September 29, 2021, AIME certified to LARA that there had been no changes in the required information since the filing of the previous Annual Report.

6. On August 30, 2022, AIME filed its 2022 Annual Report with LARA, identifying the following Officers and Directors:

    a. Mr. Summers (as President, Treasurer, and Director);

    b. Ms. Gray (as Secretary);

    c. Ms. Sweeney (as Director); and

    d. Karis Koehn ("Ms. Koehn") (as Director).[2]

---

[2] In certain documents, Ms. Koehn's name is misspelled as "Kohen." In this Answer, AIME treats the misspelling as a scrivener's error, and corrects the spelling to "Koehn" without further comment.

7. On September 29, 2023, and August 21, 2024, AIME certified to LARA that there had been no changes in the required information since the 2022 Report had been filed.

8. Beginning with its 2021 IRS Form 990, AIME identified three individuals under Part VIII, Section A as officers or directors: Mr. Summers (as President), Ms. Sweeney (as Chairman), and Ms. Koehn (as Director). Each of the three were identified as receiving compensation from AIME, in an amount ranging from $120,833 (for Mr. Summers) to $240,000 (for Ms. Sweeney). Of the three, only Ms. Sweeney is listed on Schedule J.

9. Mr. Summers, Ms. Sweeney, and Ms. Koehn were similarly the only individuals listed under Part VIII, Section A as officers or directors on AIME's 2022 IRS Form 990. Mr. Summers and Ms. Koehn reported similar compensation as the previous year, while Ms. Sweeney's compensation nearly doubled to $479,990 on an average of thirty (30) hours per week. As with 2021, only Ms. Sweeney is listed in AIME's 2022 Schedule J.

10. According to AIME's Bylaws, AIME's Board of Directors consisted of, in part, the President and Chairman. A copy of AIME's Bylaws was attached to Defendant's original Answer and Counterclaims as **Exhibit A** (Doc. 6-1).

11. As Director and Chairman, Ms. Sweeney owed fiduciary duties of loyalty and care to both AIME and its members.

11

12. From 2018 through the present, AIME's Bylaws have prohibited payment of compensation to Directors for their service on the Board of Directors.

13. From 2018 through May 2024, AIME's Bylaws prohibited payment of compensation to the Chairman. AIME adopted amended Bylaws on May 21, 2024, that permitted compensation to Officers as approved by the Board of Directors, determined using a process that includes a review and approval by independent persons. These limitations were never followed as related to Ms. Sweeney. A copy of the Amended Bylaws was attached to Defendant's original Answer and Counterclaims as **Exhibit B** (Doc. 6-2).

## II.   The Transition Agreement

14. On or about January 16, 2024, Ms. Sweeney executed a document captioned Transition Agreement and Mutual Release (the "Transition Agreement"), a true and correct copy of which was attached to Defendant's original Answer and Counterclaims as **Exhibit C** (Doc. 6-3).

15. The Transition Agreement was also signed by Mr. Summers, AIME's President, at around the same time. Mr. Summers signed the Transition Agreement at Ms. Sweeney's direction and insistence as the Chairman, and while Mr. Summers is noted on the face of the Transition Agreement as AIME's "authorized representative," the Transition Agreement was never presented to nor approved by a vote of AIME's Board of Directors.

16. Under Paragraph 1 of the Transition Agreement, Ms. Sweeney resigned "her employment" with AIME, effective March 31, 2024.

17. Under Paragraph 2 of the Transition Agreement, AIME purportedly acknowledged that Ms. Sweeney had earned a bonus in the amount of $240,000 (the "2023 Bonus") and purportedly agreed to pay the 2023 Bonus no later than February 29, 2024. The Transition Agreement does not provide any detail on how the 2023 Bonus was calculated, what metrics were considered in determining whether Ms. Sweeney had "earned" the 2023 Bonus, or any additional details.

18. Under Paragraph 3 of the Transition Agreement, AIME purportedly agreed to pay Ms. Sweeney the sum of $240,000 (the "Alleged Severance Payment") in twelve (12) monthly installments of $20,000 each, beginning April 15, 2024.

19. While the Transition Agreement refers to Ms. Sweeney as an "Employee," this is a misnomer. At the time the Transition Agreement was executed, Ms. Sweeney was not an "employee" of AIME, but rather a Director and Officer.

20. AIME's Board of Directors did not, either contemporaneously or after the fact, approve of the Transition Agreement. Rather, it appears that the Transition Agreement was unilaterally prepared and drafted by Plaintiff, negotiating her own purported exit package from AIME, and presented to Summers with a demand for signature.

13

21. Plaintiff left AIME at the end of March 2024, and has not served as either an Officer or Director of Defendant since that time.

## III.    The Sponsorship Agreement

22. Following Ms. Sweeney's 2024 departure from Defendant, Defendant became aware of the alleged Sponsorship Agreement dated January 2, 2022 ("Sponsorship Agreement"), between BAB Management, LLC d/b/a The Mortgage Xchange f/k/a Brokers Are Better, LLC ("BAB")[3] and Defendant.

23. The Sponsorship Agreement—allegedly executed by Karis A. Koehn, as SVP of Business Development on behalf of Defendant, and Ms. Sweeney, as Partner of BAB on its behalf, purported to require Defendant to provide specific benefits to BAB such as, but without limitation, the following:

   a.  The right to promote its relationship with Defendant;

---

[3] According to BAB's filings with the Maryland Secretary of State, BAB is a Maryland limited liability company that has a registered office address of 5000 Thayer Center, Suite C, Oakland, Garrett County, Maryland 21550. Upon information and belief, as of December 15, 2020, BAB has three members: (1) Strategic Mortgage Consulting Partners, LLC; (2) Strategic Compliance Partners, LLC; and (3) KMSS Consulting, LLC. Upon information and belief, Strategic Mortgage Consulting Partners, LLC is a Pennsylvania limited liability company organized by Anthony Casa, and has a registered office address of 2531 Graduate Square, Philadelphia, Pennsylvania 19146. Upon information and belief, Strategic Compliance Partners, LLC is a Maryland limited liability company organized by Ari Karen and has a registered office address of 7 St. Paul Street, Suite 820, Baltimore, Maryland 21202. Upon information and belief, KMSS Consulting, LC is a Texas limited liability company organized by Ms. Sweeney and has a registered office address of 3212 Wycliff Avenue, Dallas, Texas 75219.

b. The right to negotiate revenue share agreements to provide discounts with vendor partners on behalf of Defendant's members;

c. Use of BAB exclusively for vendor discounts;

d. Access to membership (including retaining full admin and moderator access) to the following Facebook groups: Brokers Are Better, WMN and any other private member group AIME establishes, contact and lead lists; and

e. Promotion of BAB vendor discount programs, 10x20 booth space at Defendant's national conference (i.e., Fuse), and any other Defendant event that provides exhibitor space.

24. In exchange, BAB would provide Defendant with a $0 cost sponsorship, and license to use BrokersAreBetter.com and Brokers Are Better trademark for promotional purposes including t-shirts, podcasts, etc.[4]

25. Through the use of BAB and Ms. Sweeney's access (including admin and moderator access) to Defendant's exclusive membership Facebook groups, other Defendant private member groups, and Defendant's contact and lead lists, Ms. Sweeney redirected contracts away from Defendant members and vendors to BAB.

---

[4] Ms. Sweeney and BAB's purported consideration to Defendant under the Sponsorship Agreement was a license to Defendant to use trademarks (i.e., "Brokers Are Better") that Defendant already had exclusive right and title to.

26. Upon information and belief, Ms. Sweeney led at least two (2) entities that entered into a contract with BAB to believe that they were in fact contracting with Defendant, and those entities were surprised to learn that money paid under those contracts was not received by Defendant, but BAB.

27. As with the Transition Agreement, neither Defendant's Board of Directors nor a disinterested majority thereof ever formally ratified or approved of the Sponsorship Agreement.

## COUNTERCLAIM COUNT I
### (Declaratory Judgment: Transition Agreement)

28. Defendant repeats, reiterates, and realleges each and every allegation of the preceding paragraphs as if set forth herein, verbatim and fully at length.

29. Under Michigan law, payment of salary to an officer or director is not strictly prohibited, but must comply with the nonprofit's articles of incorporation and bylaws.

30. At all times while Ms. Sweeney was an officer and director of AIME, AIME's Bylaws prohibited payment of compensation (as opposed to reimbursement for expenses actually incurred) to officers and directors.

31. Paragraphs 2 and 3 of the Transition Agreement violate AIME's Bylaws and, by extension, Michigan statute.

32. Under Michigan law, nonprofit corporations (such as AIME) may take action either by a vote during a meeting or by written action (unless prohibited by

the articles of incorporation or bylaws) if all members of the board of directors consent to the action in writing and the written action is filed with the other minutes of the nonprofit corporation.

33. The Transition Agreement was not approved by vote of the Board of Directors at a meeting.

34. AIME's Bylaws at the time permitted the Board of Directors to take action without a meeting if both the Chairman and President adopt a written resolution authorizing the action *and* that written action is filed with the minutes of the proceedings of AIME's Board of Directors. There was no written resolution adopted by the Chairman and President authorizing the Transition Agreement, and no such written action was filed with the minutes of the proceedings of AIMIE's Board of Directors.

35. In addition, the person signing the Transition Agreement did not have the authority under AIME's By-Laws to execute the same on behalf of AIME. His authority, if any, was specifically limited under the AIME By-Laws and the amounts to be paid under the Transition Agreement, as well as the value of the release of any claims under the same, exceeded that authority. As required by TEX. CIV. PRAC. & REM. CODE § 37.006, all persons or entities who have or claim any interest that would be affected by a declaration of the validity (or lack thereof) of the Transition Agreement are parties to this action.

17

36. Accordingly, AIME is entitled to a declaration under the Uniform Declaratory Judgments Act, codified at Chapter 37 of the Texas Civil Practice and Remedies Code, that the Transition Agreement (specifically but not limited to the payment provisions in Paragraphs 2 and 3 and the purported release in Paragraph 5) is void *ab initio* and *ultra vires*, that the Transition Agreement is rescinded, and that AIME is entitled to a complete accounting of any amounts paid to Ms. Sweeney in connection with the Transition Agreement.

### COUNTERCLAIM COUNT II
### (Breach of Fiduciary Duties: Transition Agreement)

37. Defendant repeats, reiterates, and realleges each and every allegation of the preceding paragraphs as if set forth herein, verbatim and fully at length.

38. Dating at least as far back as 2021, Plaintiff has, among other things, received compensation from Defendant either as an officer or as a director, despite the fact that Defendant's Bylaws specifically prohibited her from receiving such compensation.[5]

39. As an officer and director of Defendant, Plaintiff owed Defendant and its members a duty of loyalty and care, including a duty to act in good faith, a duty to act with the care of an ordinarily prudent person in a like position

---

[5] While an argument could potentially be made that Sweeney was an employee, the 2018 By-Laws specifically provided that as Chairman she was not entitled to compensation.

exercising such care under similar circumstances, and a duty to act in a manner reasonably believed to be in the best interests of the corporation.

40. By awarding herself a salary and bonus, and by drafting and demanding that the Transition Agreement be signed by Defendant, and by accepting compensation to which she was not entitled – and in fact was prohibited from receiving – Plaintiff breached her fiduciary duties to AIME.

41. At no time did Plaintiff seek Board approval or approval from any outside disinterested party. Instead, contrary to Defendant's Bylaws, she engaged in self-serving conduct that directed payments of over $900,000 to her personally. These payments were contrary to the internal and governing documents of the Defendant, as applied to the Plaintiff, and should be clawed back.[6]

---

[6] While not intended to be an exhaustive list of Plaintiff's self-dealing, in 2024 (after Ms. Sweeney's departure), AIME learned that, over a two-year time span, Ms. Sweeney had used AIME personnel, administrative tools and resources, and access to data on AIME's members to craft, invoice, and collect on for-profit contracts between third-party organizations on the one hand and companies in which Ms. Sweeney held a vested interest on the other. Additionally, while serving as a Director and Chairman of AIME, Ms. Sweeney founded Broker Action Coalition, Inc. ("BAC"), a Delaware corporation, and ran BAC parallel with AIME to negotiate contracts with lender partners that diverted monetary contributions away from AIME to BAC. These intrusions and diversion of opportunity continue as Plaintiff has created a mechanism to divert internet traffic from AIME to websites that are under her control, giving the user, upon information and belief, the false impression that it is interfacing with AIME. Despite repeated requests for this practice to cease, Plaintiff has refused.

19

42. As a result of Plaintiff's breach of her fiduciary duties to Defendant, Defendant has been damaged in an amount to be determined at trial, but believed to be in excess of $75,000, exclusive of interest, costs, and fees as more fully articulated below:

    a. At least $240,000 in compensation received by Plaintiff in 2021;

    b. At least $479,999 in compensation received by Plaintiff in 2022;

    c. Any amount received as compensation by Plaintiff in 2023; and

    d. Any amount received as compensation by Plaintiff in 2024.

### COUNTERCLAIM COUNT III
### (Breach of Fiduciary Duties: Sponsorship Agreement)

43. Defendant repeats, reiterates, and realleges each and every allegation of the preceding paragraphs as if set forth herein, verbatim and fully at length.

44. In and around 2022, Plaintiff was an officer and director of Defendant.

45. In and around 2022, Plaintiff simultaneously held membership interest in BAB.

46. On or around January 1, 2022, Plaintiff allegedly executed the Sponsorship Agreement between BAB and Defendant, as Partner of BAB on its behalf, while also serving as Defendant's officer and director.

47. According to Section 10.05 of Defendant's Bylaws, as officer and director of Defendant, Ms. Sweeney was required to disclose her interest in BAB to Defendant's entire Board of Directors and a majority of disinterested directors

were required to ratify and approve the Sponsorship Agreement, otherwise, the Sponsorship Agreement would be invalid.

48. As an officer and director of Defendant, Plaintiff owed Defendant a fiduciary duty to disclose the conflict-of-interest arising from Plaintiff's direct or indirect, pecuniary or otherwise, membership interest in BAB.

49. At no time did Plaintiff disclose or seek ratification or approval from the remaining disinterested Board of Directors of Defendant. Instead, contrary to Defendant's Bylaws, Plaintiff utilized her position as officer and director of Defendant to engage in further self-serving conduct that redirected Defendant members and vendors away from Defendant and to BAB.

50. By entering into the Sponsorship Agreement without disclosing Plaintiff's membership interest in BAB and redirecting Defendant member and vendor contracts and transactions away from Defendant but to BAB, Plaintiff breached her fiduciary duties to Defendant.

51. As a result of Plaintiff's breach of her fiduciary duties to Defendant, Defendant has been damaged in an amount to be determined at trial, but believed to be in excess of $75,000, exclusive of interest, costs, and fees.

## COUNTERCLAIM COUNT IV
### (Fraud: Transition Agreement)

52. Defendant repeats, reiterates, and realleges each and every allegation of the preceding paragraphs as if set forth herein, verbatim and fully at length.

53. At the time that Plaintiff signed the alleged Transition Agreement and at the time Plaintiff presented the alleged Transition Agreement to Marc Summers and demanded that Mr. Summers sign the alleged Transition Agreement on behalf of Defendant, Plaintiff was an officer and director of Defendant.

54. As an officer and director of Defendant, Plaintiff had a duty to disclose to Defendant all material facts related to the alleged Transition Agreement.

55. At the time Plaintiff signed the Transition Agreement and at the time Plaintiff presented the alleged Transition Agreement to Marc Summers and demanded that Mr. Summers sign the alleged Transition Agreement on behalf of Defendant, Plaintiff intentionally omitted, concealed, and failed to disclose to Defendant the following materials facts:

    a. That the Sponsorship Agreement had been signed without approval by Defendant's Board of Directors or a disinterested majority of such Board of Directors.

    b. The benefits that BAB had received, was receiving, and would continue to receive under the Sponsorship Agreement.

    c. The benefits that Plaintiff had personally received, was receiving, and would continue to receive under the Sponsorship Agreement.

    d. That Plaintiff had used her access (including admin and moderator access) to Defendant's exclusive membership Facebook groups, other

Defendant private member groups, and Defendant's contact and lead lists to redirect actual and potential members and vendors away from Defendant and to BAB.

e.  That Plaintiff had led entities that entered into contracts with BAB to believe that they were in fact contracting with Defendant.

f.  That Plaintiff had used Defendant's personnel, administrative tools and resources, and access to data on Defendant's members to craft, invoice, and collect on for-profit contracts between third-party organizations on the one hand and companies in which Plaintiff held a vested interest on the other.

g.  That Plaintiff ran BAC parallel with Defendant to negotiate contracts with lender partners that diverted monetary contributions away from Defendant to BAC.

h.  That Plaintiff had created a mechanism to divert internet traffic from Defendant to websites that are under Plaintiff's control, giving the user the false impression that it is interfacing with Defendant.

i.  That Plaintiff had registered the phrase "Brokers are Better" with the United States Patent and Trademark Office (the "USPTO") indicating in that filing that it belonged to Plaintiff and BAB, when in fact, it appropriately belongs to Defendant.

j. That Plaintiff maintained and would continue to maintain control of Defendant's website after her departure from Defendant.

56. In addition, Plaintiff deliberately failed to disclose to Defendant's Board of Directors and to a disinterested majority of such Board of Directors the material fact that she was an officer and director of AIME and stood to personally benefit from the alleged Transition Agreement.

57. As both director and officer of Defendant, Plaintiff had a duty to disclose her fiduciary relationship with Defendant when she purportedly entered into the Transition Agreement because there existed a conflict-of-interest, whereby Plaintiff stood to and, in fact, did personally benefit from the alleged Transition Agreement.

58. Defendant was ignorant or Plaintiff was silent as to the Transition Agreement allegedly entered into with Ms. Sweeney, because, upon information and belief, the Transition Agreement was only set forth by Marc Summers and Ms. Sweeney and was not disclosed to the remainder of Defendant's Board of Directors.

59. Plaintiff intended Defendant to allegedly enter into the Transition Agreement and to perform under the Transition Agreement based on Plaintiff's non-disclosure, omission, and concealment as set forth above.

60. Defendant relied on Plaintiff's non-disclosures, omissions, and concealments as set forth above.

61. To the extent that Marc Summers' signature on the Transition Agreement is deemed to be a valid signature on behalf of Defendant (which Defendant expressly denies) such signature would not have been made if Plaintiff had disclosed all material facts in connection with the Transition Agreement.

62. Defendant also relied on Plaintiff's non-disclosures, omissions, and concealments as set forth above by making payments to Plaintiff pursuant to the Transition Agreement. Such payments would not have been made if Plaintiff had disclosed all material facts in connection with the Transition Agreement.

63. As a result of Plaintiff's fraudulent non-disclosures, omissions, and concealments, Defendant has been damaged in an amount to be determined at trial, but believed to be in excess of $75,000, exclusive of interest, costs, and fees.

64. In addition, as a result of Plaintiff's fraud, the Transition Agreement is void, voidable, or otherwise unenforceable.

**COUNTERCLAIM COUNT V**
**(Unjust Enrichment)**

65. Defendant repeats, reiterates, and realleges each and every allegation of the preceding paragraphs as if set forth herein, verbatim and fully at length.

66. Through receipt of compensation for her role as either an officer or director of Defendant, Plaintiff was conferred a benefit of which she was fully aware.

67. Plaintiff retained the monies paid to her as compensation despite her knowledge that such compensation was not permitted (and, in fact, was prohibited) by Defendant's Bylaws.

68. Allowing Plaintiff to retain the payments made to her would be inequitable.

69. As a result of these inequitable circumstances, Defendant has been damaged in an amount to be determined at trial, but believed to be in excess of $75,000, exclusive of interest, costs, and fees as more fully articulated below:

   a. At least $240,000 in compensation received by Plaintiff in 2021;

   b. At least $479,999 in compensation received by Plaintiff in 2022;

   c. Any amount received as compensation by Plaintiff in 2023; and

   d. Any amount received as compensation by Plaintiff in 2024.

## PRAYER FOR RELIEF

**WHEREFORE**, AIME respectfully requests relief from this Court as follows:

1. Declare pursuant to the Uniform Declaratory Judgments Act that the Transition Agreement is void *ab initio* and *ultra vires*;

2. Declare pursuant to the Uniform Declaratory Judgments Act that the Transition Agreement be rescinded in full;

26

3. Order a complete accounting of all amounts paid to Ms. Sweeney by AIME in connection with the Transition Agreement;

4. Order that all amounts paid to Ms. Sweeney by AIME in connection with the Transition Agreement be returned to AIME;

5. That judgment be entered in favor of AIME against Ms. Sweeney in an amount to be determined at trial but in excess of $75,000 (exclusive of interest, costs, and disbursements);

6. Award AIME its fees and costs (including reasonable attorney fees) to the fullest extent permitted by law; and

7. Such other relief as the Court may determine just and warranted.

Respectfully Submitted,

**MADIGAN, DAHL & HARLAN, P.A.**

Dated: September 10, 2025

Thomas P. Harlan, (MN Bar No. 210870), *pro hac vice*
Christopher W. Bowman (MN Bar No. 389933), *pro hac vice*
Trenton K. Seegert (MN Bar No. 504174), *pro hac vice*
33 South Sixth Street, Suite 3675
Minneapolis, MN 55402
Phone: 612-604-2000
harlan@mdh-law.com
bowman@mdh-law.com
seegert@mdh-law.com

*-and-*

27

**DROEL PLLC**

s/Evan H. Weiner
Tim L. Droel (TX Bar No. 24075548)
Evan H. Weiner (MN Bar No. 389176), *pro hac vice*
5625 F.M. 1960 West, Suite 214
Houston, TX 77069
Phone: (832) 701-9905
tdroel@droellaw.com
eweiner@droellaw.com

*Attorneys for Defendant Association of Independent Mortgage Experts*